IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANNAH JAMES,
Survivor of David Lee Lang,

       Plaintiff,

     v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

       Defendant.

6:17-cv-00600-PK

OPINION & ORDER

PAPAK, Magistrate Judge:

Plaintiff Annah James on behalf of David Lang seeks judicial review of the Commissioner of Social Security's final decision denying Lang's application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C. § 636(c). Docket No. 14. The Court has considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision is REVERSED and REMANDED for an immediate payment of benefits.

PAGE 1 – OPINION & ORDER

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, an Administrative Law Judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 404.1520(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-41; *see also* 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, Subpt. P, App. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 404.1545(a); *see also* SSR 96-8p, 1996 WL 374184, at *1.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. If the Commissioner meets its burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566.

## LEGAL STANDARD

A reviewing court must affirm an ALJ's decision if the ALJ applied proper legal standards and his findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.* (citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). The court may not substitute its judgment for that of the Commissioner. *See id.* (citing *Robbins*, 466 F.3d at 882); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation."

*Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citing *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).

## BACKGROUND

Born in 1952, Lang was 58 years old on the amended alleged disability onset date of January 1, 2011, and 62 years old at the time of the hearing. Tr. 40-41, 205.[2] He graduated from high school and had past relevant work experience as a shamanic practitioner. Tr. 49, 292. On January 30, 2013, Lang applied for DIB, originally alleging a disability onset date of January 1, 2009. Tr. 274. He alleged disability due to fibromyalgia, diabetes, diabetic neuropathy, back injuries, glaucoma, degenerative back disease, scoliosis, trigeminal neuralgia, and sleep apnea. Tr. 291.

Lang's application for DIB was denied initially and on reconsideration, and on December 26, 2013, he requested a hearing before an ALJ. Tr. 113-16, 120-24. On October 8, 2015, a hearing was conducted before ALJ Robert Spaulding; at which Lang, his counsel, and Mark Mann, a Vocational Expert ("VE"), were present. Tr. 33-87. At the hearing, Lang amended his alleged onset date to January 1, 2011. Tr. 40. On November 4, 2015, the ALJ denied Lang's application for DIB, Tr. 16-27, and Lang timely requested review of the ALJ's decision. Tr. 11. On February 17, 2017, the Appeals Council issued a decision finding Lang not disabled under the Act, although for a different reason than the ALJ provided in his decision. Tr. 1-7.[3] Consequently, the Appeals Council's decision, including the portions of the ALJ's findings adopted by the Appeals Council, became the Administration's final order for purposes of judicial

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 17.

[3] James reports that subsequent to the Appeals Council's determination, Lang reapplied for DIB and the Agency found him disabled as of September 1, 2016. Pl.'s Br. at 2, n.2 (docket no. 9).

review. *See* 20 C.F.R. § 422.210(a); *see also Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). This action followed.

## SUMMARY OF THE COMMISSIONER'S FINDINGS

At the first step of the five-step sequential evaluation process, the ALJ found Lang did not engage in substantial gainful activity at any time during the period from the amended alleged onset date of January 1, 2011, through the date of the hearing. Tr. 18.

At the second step, the ALJ found Lang had the following severe impairments: chronic pain syndrome, diabetes mellitus, and diabetic peripheral neuropathy. *Id.* The ALJ found Lang's upper lumbar and lumbosacral spondylosis, sleep apnea, and depression were not severe impairments. *Id.* The ALJ also found Lang's fibromyalgia was not diagnosed "in a proper manner to be valid." Tr. 24.

At the third step, the ALJ found that none of Lang's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, Subpt P, App. 1. Tr. 20. The ALJ therefore conducted an assessment of Lang's RFC. Specifically, the ALJ found that Lang had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with the following additional limitations: "[T]he claimant is able to occasionally climb ramps and stairs but no climbing ladders or scaffolds; is able to frequently balance and stoop; is able to occasionally kneel, crouch, and crawl; and should have only occasional exposure to hazards such as unprotected heights and moving mechanical parts." Tr. 20-26. In reaching this finding, the ALJ stated that he considered all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. *Id.* The ALJ also considered opinion evidence. Tr. 24-26.

At the fourth step, the ALJ determined that Lang's past work as a shaman was consistent with the occupation of a counselor, as defined in the Dictionary of Occupational Titles ("DOT").

Tr. 26-27. The ALJ found Lang not disabled based on the VE's testimony that Lang was capable of performing the job of a counselor as it is generally performed in the economy. *Id.* Accordingly, the ALJ did not proceed to the fifth step because he found Lang not disabled at step four.

On review, the Appeals Council found that the occupation of a shaman did not directly correspond to the occupation of a counselor. Tr. 5. Thus, the Appeals Council determined that the ALJ's finding that Lang could perform the counselor job as it is generally performed in the economy was "not supported by the record." *Id.* The Appeals Council, however, found Lang could return to his past work as a shaman as he actually performed it, "despite the [VE's] testimony to the contrary." *Id.* Accordingly, the Appeals Council determined that Lang was not disabled at any time from January 1, 2011, the disability onset date, through the date of the ALJ's decision, November 4, 2015. *Id.*

## ANALYSIS

James argues: (1) the ALJ failed to give clear and convincing reasons for rejecting Lang's symptom testimony; (2) the ALJ failed to provide legally sufficient reasons for assigning little weight to the opinion of treating physician Dr. Peter Ganter; and (3) the Appeals Council erred in finding Lang was able to return to his past relevant work as a shaman. Each argument is addressed in turn.

### I.      Lang's Symptom Testimony

James argues the ALJ erred in rejecting Lang's subjective symptom testimony. The Ninth Circuit established two requirements for a claimant to present credible symptom testimony: the claimant must produce objective medical evidence of an impairment or impairments; and must show the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986). The claimant,

however, need not produce objective medical evidence of the actual symptoms or their severity. *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996).

If the claimant satisfies the above test and there is not any affirmative evidence of malingering, as is the case here, the ALJ can reject the claimant's testimony only if the ALJ provides clear and convincing reasons for doing so. *Parra v. Astrue,* 481 F.3d 742, 750 (9th Cir. 2007). General assertions that the claimant's testimony is not credible are insufficient. *Id.* The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (citing *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995)). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). However, even if not all of the ALJ's findings for discrediting symptom allegations are upheld, the overall decision may still be upheld, assuming the ALJ provided other valid rationales. *Batson,* 359 F.3d at 1197.

The ALJ first found Lang's symptom testimony less than entirely credible based on his reported activities of daily living ("ADLs"). Tr. 23. An ALJ may discount a claimant's testimony if it is inconsistent with the claimant's ADLs, or if the claimant's participation in everyday activities indicates capacities that are transferrable to a work setting. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007); *Molina v. Astrue,* 674 F.3d 1104, 1112-13 (9th Cir. 2012). A claimant, however, need not be utterly incapacitated to receive disability benefits, and sporadic completion of minimal activities is insufficient to support an adverse credibility finding. *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001); *see also Reddick,* 157 F.3d at 722 (requiring the level of activity to be inconsistent with the claimant's alleged limitations to be relevant to his or her credibility).

Here, the ALJ noted that in June 2013, Lang reported:

> [H]e was able to care for a pet, handle personal care without problems or reminders, attend appointments, prepare meals daily, clean/vacuum, do laundry, perform a little yard work, go outside daily, drive, ride a bicycle for less than one mile, visit friends, shop in stores, go out to coffee shops/eateries/library, get along with others, do some art and music composition, watch movies, read a book or electronic material, use a computer, pay bills, count change, handle a savings account, use a checkbook/money order, finish tasks, and follow both written and spoken instructions.

Tr. 23; *see also* Tr. 318-326. The ALJ characterized these ADLs as "quite involved" and found they were "inconsistent with the disabling levels of pain and mental health symptoms [Lang] alleged[.]" Tr. 23.

The ALJ's mere recitation of Lang's reported ADLs and conclusory assertion that they were inconsistent with the entirety of Lang's symptom testimony falls well short of the requisite "clear and convincing" standard. *Reddick*, 157 F.3d at 722 ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.") (quoting *Lester*, 81 F.3d at 834; *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)). Moreover, the ALJ mischaracterized the record by failing to mention the limited and sporadic nature in which Lang carried out his ADLs. For example, Lang reported that his ability to do household chores, yardwork, and leisurely activities varied from day-to-day depending on his pain and energy levels; and, even when his pain and energy levels were favorable, his performance of ADLs was typically brief and punctuated by rest. Tr. 318, 322-24.

The Ninth Circuit has noted that "many home activities are not easily transferable to . . . the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Moreover, claimants "need not vegetate in a dark room in order to be deemed eligible for benefits," and "should not be penalized for attempting to lead normal lives in the face of their limitations."

*Reddick*, 157 F.3d at 722 (citations and quotation marks omitted). Despite the ALJ's assertion to the contrary, Lang's ADLs were far from "quite involved," and did not suffice as a clear and convincing reason for disregarding Lang's symptom testimony. *See Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014) ("The critical differences between [ADLs] and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . ., and is not held to a minimum standard of performance . . . . The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by [ALJs] in social security disability cases.") (citation omitted).

The ALJ next found Lang's symptom testimony was undermined by two "huge gaps in [his] treatment." Tr. 23. An "'unexplained, or inadequately explained, failure to seek treatment' may be the basis for an adverse credibility finding unless one of a 'number of good reasons for not doing so' applies." *Orn*, 495 F.3d at 638 (quoting *Fair*, 885 F.2d at 603). One of those "good reasons" is a "claimant's failure to obtain treatment he cannot obtain for lack of funds." *Id.* (citation omitted). The ALJ first found that despite alleging he became disabled in January 2011, Lang did not seek medical treatment until June 2011. Tr. 23. "[B]ecause a person's normal reaction is to seek relief from pain, and because modern medicine is often successful in providing some relief," a claimant's failure to seek treatment raises the inference that the claimant's pain testimony might be "unjustified or exaggerated." *Orn*, 495 F.3d at 638. Here, however, the record indicates that beginning in 2009, pain specialist Dr. Anita Dekker began treating Lang's chronic pain issues with physical therapy and narcotic pain medication. *See* Tr. 217, 441, 454, 457.

The ALJ also noted there was "no medical evidence between August 24, 2013 and May 8, 2014." Tr. 23. Lang testified that during this timeframe he "just forged ahead as best [he]

could" because he was unable to afford the $280 per doctor visit and had no health insurance until he qualified for the Oregon Health Plan in 2014. Tr. 62. He was still able to get his prescriptions during that time because he had refills remaining. *Id.* The ALJ found this explanation unpersuasive, noting that Lang "was able to afford medical marijuana, he continued to afford prescription medications during this time, and his wife reported they had the money to hire a contractor to do work at their house." Tr. 23. The ALJ's finding assumes too much. There is nothing in the record specifying how much Lang spent on medicinal cannabis, his prescription refills, or the raised garden beds his wife hired a contractor to build. *See, e.g.*, Tr. 60-69, 398.

Lang's wife reported she hired a contractor to build "waist-high" garden beds in order to accommodate Lang's physical limitations so he could still "help harvest food." Tr. 398. Additionally, Lang's course of treatment before he lost health insurance coverage consisted primarily of medication management, with few changes. *See* Tr. 415-25, 432-59. Noting "[i]nadequate [pain] control on the current medical regimen" in December 2012, Lang's primary care physician, Dr. Peter Ganter, ordered a consult with rheumatologist Dr. William Hinz to "confirm or expand the diagnosis and discuss management." Tr. 441. On consultation in February 2013, Dr. Hinz expressed that "overall [Lang] had a very good therapeutic regimen established by his primary care physician," and recommended Lang continue "his current medication plan." Tr. 430. Thus, the treatment records demonstrate that, although inadequate, Lang's course of treatment was as good as it was going to get. Besides being unsupported, the ALJ's finding was most problematic because it penalized Lang for prioritizing symptom relief over visiting his doctors—who already indicated there was not much more that could be done in terms of treatment—when faced with limited resources and no health insurance. Accordingly,

the ALJ's notion that Lang could have afforded additional doctors' visits out of pocket because he had some unspecified amount of funds to afford a handyman, medical cannabis, and his medications was based on pure speculation, not substantial evidence.

The ALJ next found that Lang's report that he was "functioning well" after he was able to reestablish care suggested that "the gap [in treatment] was likely because he was doing well." Tr. 23. The ALJ also found in general that the record "showed that [Lang's] conditions of chronic pain, diabetes, and diabetic neuropathy responded well to medication," which was "supported by the mostly normal physical, neurological, and mental examinations." *Id.* "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [DIB] benefits." *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (citations omitted). However, "[r]eports of 'improvement' . . . must be interpreted with an understanding of the patient's overall well-being and the nature of h[is] symptoms." *Garrison*, 759 F.3d at 1017 (citation omitted); *see also Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001).

Here, the ALJ discussed several treatment records indicating normal examination findings and Lang's reports of improvement; however, many of those records are consistent with Lang's symptom allegations. *Compare* Tr. 68 (pain and fatigue caused good days and bad days), *and* Tr. 75-76 (required daily naps and frequent breaks), *with* Tr. 424 (chronic pain caused "good days and bad days"), Tr. 432 ("need to take frequent rests and sometimes naps to manage pain and make it through the day"), *and* Tr. 458 (one hour nap in afternoon). The ALJ also mischaracterized the record. For example, the ALJ noted that in August 2013, Lang "indicated that he was doing well in terms of pain and 'he was quite active without flares recently.'" Tr. 22 (citing Tr. 417). But, the ALJ's discussion glosses over the fact that Dr. Ganter also completed

paperwork for Lang to get a medical cannabis license because he suffered from "severe pain" that "[wa]s not adequately controlled with a fairly complex medical regimen." Tr. 417; *see also* Tr. 438 (significant pain despite good medical compliance). Similarly, the ALJ noted that in August 2014, Dr. Ganter conveyed that Lang "had a normal physical examination and his chronic medical problems were well controlled on his current medication regime." Tr. 22 (citing Tr. 623). However, the ALJ failed to mention that Dr. Ganter also specified that "[a]fter 2 hours of any activity [Lang] is to rest for at least half an hour," which is entirely consistent with Lang's testimony that he required frequent breaks. Tr. 619. Accordingly, the ALJ's assertions that Lang responded well to medication and had normal examinations were not clear and convincing reasons to find Lang's symptoms were not as severe as alleged.

The ALJ's finding that Lang's receipt of "conservative and intermittent treatment suggest[ed] his impairments do not result in significant functional limitations that preclude[d] him from engaging in basic work activity" also fails. Tr. 23-24. Although a claimant's receipt of only conservative treatment can serve as a basis for rejecting his testimony, "[a] claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist." *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010). Here, beyond asserting in a conclusory fashion that Lang's treatment was conservative, the ALJ did not point to any evidence suggesting that more aggressive treatment options were available to him. *See* Tr. 23-24 As discussed, Dr. Hinz agreed with Dr. Ganter's course of treatment and did not recommend more aggressive treatment. Tr. 430. Consequently, the ALJ erred.

Finally, the ALJ discredited Lang's testimony because the "evidence relating to his earnings records is inconsistent and there is evidence of earnings after . . . his alleged onset date[], which impacts credibility." Tr. 24. Lang's testimony, however, was entirely consistent

with his earning records. Indeed, Lang testified that he stopped working as a part-time web page developer in 2011, which is consistent with the payroll records from Cellular Accessory detailing that Lang earned no income from that source in 2011. Tr. 47-48, 267-73. Lang also testified that he stopped working as a shaman at the end of 2012, which is consistent with the certified earnings record showing Lang earned no income after 2012. Tr. 49, 209-12. Moreover, the Court fails to see how the discrepancies between Lang's detailed and certified earnings report and the Cellular Accessory payroll detail have any bearing on the overall truthfulness of Lang's symptom testimony. *See Popa v. Berryhill*, 872 F.3d 901, 906-07 (9th Cir. 2017) ("A single discrepancy fails, however, to justify the wholesale dismissal of a claimant's testimony.") (citation omitted).

In sum, the ALJ failed to provide clear and convincing reasons, based on substantial evidence, for discrediting Lang's symptom testimony.

## II.     Dr. Ganter's Opinion

James argues the ALJ erred in giving little weight to the opinion of Dr. Ganter. Specifically, James contends the ALJ failed to provide sufficient reasons for discrediting Dr. Ganter's opinion that Lang "would likely not be able to attend to a full-time eight hour per day job with usual breaks on a sustained basis," "would probably have to rest after one or two days of work and require prolonged recovery time," and "often has to rest whenever he does anything more strenuous than his usual activities of daily living." Tr. 558. To reject the uncontroverted opinion of a treating or examining physician, an ALJ must articulate "clear and convincing" reasons for so doing. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 830-831). If a treating or examining physician's opinion is in conflict with substantial medical evidence or with another physician's opinion, however, it may be rejected for merely "specific and legitimate reasons." *Id.*

Dr. Ganter's opinion was contradicted by the opinion of non-examining reviewing consultant, Dr. Lloyd Wiggins. *Compare* Tr. 558, *with* Tr. 96-98. Thus, the ALJ needed to provide only specific and legitimate reasons for rejecting Dr. Ganter's opined limitations. *Bayliss,* 427 F.3d at 1216. Here, the ALJ proffered several reasons for giving Dr. Ganter's opinion little weight; however, none of those reasons withstands scrutiny.

The ALJ first discounted Dr. Ganter's opinion because he "indicated that he based his opinion mainly on the claimant's subjective symptoms." Tr. 25. "An ALJ may reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Morgan v. Comm'r Soc. Sec. Admin.,* 169 F.3d 595, 602 (9th Cir. 1999)); *see also Fair,* 885 F.2d at 605; *Batson,* 359 F.3d at 1195. To begin, the ALJ's assertion that Dr. Ganter based his opinion "mainly" on Lang's reports is an overstatement. To the contrary, Dr. Ganter explained that his opinion was based on "chart review and research," his treatment history with Lang, rheumatologist Dr. Hinz's consultation, and physiatrist Karla Austin's evaluation. Tr. 558. Moreover, as discussed, the ALJ failed to provide sufficiently clear and convincing reasons for discrediting Lang's symptom testimony. Accordingly, the ALJ's erroneous credibility determination was not a valid basis for rejecting Dr. Ganter's opinion.

Next, the ALJ found that Dr. Ganter failed to "explain the claimant's diffuse joint pain." Tr. 25. "An ALJ may discredit treating physicians' opinions that are . . . unsupported by the record as a whole or by objective medical findings." *Batson,* 359 F.3d at 1195 (internal citations omitted). Dr. Ganter opined that while Lang's "moderate to severe bilateral nerve root foraminal stenosis" did not explain his "widespread muscle and joint aches," his "severe fibromyalgia syndrome" did. Tr. 558. James concedes that the ALJ properly concluded that Lang's

fibromyalgia diagnosis did not meet the criteria for a valid diagnosis under the Agency's regulations. *See* SSR 12-2p, 2012 WL 3104869, at *3 (requiring, in relevant part, "[a]t least 11 positive tender points on physical examination"). However, throughout the record Dr. Ganter, as well as Dr. Hinz, consistently referred to and treated Lang's fibromyalgia and chronic pain syndrome as highly interrelated impairments, the latter of which the ALJ found severe and medically determinable at step two. Tr. 19; *see also, e.g.*, 424, 430, 435, 441, 457, 582. Dr. Ganter even stated that the overall medical basis for his opinion was Lang's "chronic pain syndrome, most consistent with fibromyalgia presenting with diffuse joint and muscle pains." Tr. 558. Thus, the ALJ erred in rejecting Dr. Ganter's opinion to the extent it was based on Lang's chronic pain syndrome.

Finally, the ALJ gave little weight to Dr. Ganter's opinion because he "acknowledged that the claimant's physical and mental capacity for work was currently undetermined." Tr. 25, 558. Although an ALJ may give less weight to a medical opinion if it is internally inconsistent, *Morgan*, 169 F.3d at 603; here, the ALJ failed to explain how Dr. Ganter's statement that "[i]t is undetermined what the patient's physical and mental capacity for work is currently" undermined the specific limitations Dr. Ganter did put forward in his opinion. Tr. 25, 558. Notably, Dr. Ganter did not provide limitations relating to Lang's physical and mental capacity in terms the Agency utilizes, such as his ability to stand, sit, crouch, lift, concentrate, persist, interact with others, etc., but his failure to do so does not detract from his opinion that Lang required prolonged recovery time and would need to take a break after only a day or two of work. Accordingly, the ALJ erred because he did not provide specific and legitimate reasons for disregarding Dr. Ganter's opinion.

## III.    Step Four Finding

James argues the Appeals Council erroneously found Lang could return to his past work as a shaman as he actually performed it.   At step four of the sequential analysis, the Commissioner must determine whether a claimant is capable of performing his or her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past work.  *See* 20 C.F.R. § 404.1560(b).   In determining the requirements of a particular position, an ALJ may refer to a claimant's past work as he actually performed it, 20 C.F.R. § 404.1565(b), or the ALJ may take administrative notice of generic job descriptions contained in the DOT.  *See* SSR 82-61, 1982 WL 31387, at *1-2.

At the hearing, Lang detailed that his work as a shaman consisted of performing "rituals" or "journey work," where he would lie down next to a client, touching shoulder-to-shoulder and foot-to-foot.  Tr. 51.  After using the sound of a drum beat to "entrain" his clients into a lucid "dream state," Lang's responsibility was to "stay awake" and "pay attention to the entire experience," which could last "anywhere from [a] half-hour to several hours."  *Id.*  Lang testified that he no longer had the "incredible amount of focus" the job required, and he could no longer "endure the lying down," because after a 30 minutes his pain levels caused him to "lose focus in the journey."  Tr. 57-58.

After noting that the occupation of shaman is not contemplated by the DOT, the VE testified that the occupation of counselor "was not a great match," but it was "the best fit."  Tr. 80.  In response to the ALJ's inquiry about whether a hypothetical individual with Lang's RFC could return to his work as a shaman as he actually performed it, the VE testified Lang's past work "would be ruled out" due to the need to get up and down from the floor.  Tr. 78.  The VE stated, however, that, per the DOT, Lang would be able to perform the occupation of counselor as generally performed in the national economy.  Tr. 82.  Based on this testimony, the ALJ found

Lang not disabled at step four. Tr. 26-27. On review, the Appeals Council determined that the ALJ's step four finding was "not supported by the record," because "the shaman job d[id] not directly correspond to the counselor job." Tr. 5. However, the Appeals Council found that Lang could "perform the job of shaman as he actually performed it," despite the VE's testimony to the contrary. *Id.*

James contends that the Appeals Council's basis for rejecting the VE's opinion—Lang's June 2013 work history report—does not support the Appeals Council's finding. Tr. 5, 313. James argues that Lang's description of his shamanic practice in the 2013 report was entirely consistent with the more detailed description he gave at the hearing, upon which the VE based his opinion. *Compare* Tr. 313, *with* Tr. 48-52, 57-58. Although Lang made no mention of his need to lay down on the floor with his clients in the 2013 report, he described going into "shamanic trance states," which is similar to the "journey work" he testified about at the hearing. Tr. 313. Moreover, while the work history form asked Lang to detail the amount of time he spent standing, sitting, walking, crouching, etc., the form did not inquire of Lang the amount of time he spent lying down. *Id.* Thus, argues James, the Appeals Council erred in relying on Lang's 2013 work history report instead of his hearing testimony.

The Commissioner argues the Appeals Council's finding was proper because Lang's RFC—as determined by the ALJ and adopted by the Appeals Council—was consistent with the requirements of Lang's past work as a shaman as he described it at the hearing. Specifically, the VE indicated that Lang could not return to his past work due to the need to "get[] up and down off the floor;" however, the RFC contained no limitations restricting Lang's ability to transfer positions or lie down. Tr. 78. Therefore, Lang's 2013 work history report is immaterial because

the shaman job as described by Lang at the hearing is entirely consistent with his RFC.[4] The Court agrees. Given that the RFC did not limit Lang's ability to lie down or change positions, the VE's opinion was not based on limitations included in the hypothetical presented by the ALJ. Tr. 78. Accordingly, the Appeals Council did not explicitly err by rejecting the VE's unsupported testimony and properly concluded that Lang's RFC was compatible with his past work as a shaman. *See* 20 C.F.R. § 404.1560(b).

As discussed, however, the ALJ erred in discrediting Lang's symptom testimony and Dr. Ganter's opinion. As such, the Appeals Council's step four finding rests on tenuous footing and the Court's decision to uphold it is simply a reflection of the fact that the erroneously determined RFC was not inconsistent with Lang's shaman work as he described it.

## REMAND

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011) (citing *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th

---

[4] James contends the Commissioner's argument is a *post-hoc* justification that cannot serve as a basis for upholding the Appeals Council's finding. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009). However, the Commissioner's argument is not new; rather, it is simply a reassertion of the Appeals Council's finding that "[t]he limitations on the claimant's ability to perform work-related activities as set forth in [the RFC] do not preclude the claimant from performing his past relevant work as a shaman, as he actually performed this job." Tr. 6; *see also Molina*, 674 F.3d at 1121 ("Even when an agency explains its decision with less than ideal clarity, [a reviewing court] must uphold it if the agency's path may be reasonably discerned.") (citation and internal quotation marks omitted).

Cir. 2004)). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id.* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Strauss*, 635 F.3d at 1138. The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 348 (9th Cir. 1991) (en banc)). However, even if all the requirements of the analysis are met, a court may nevertheless remand "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled" within the meaning of the Act. *Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (quoting *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014)) (internal quotation marks omitted).

The ALJ's failure to credit the testimony of Lang and Dr. Ganter was erroneous for the reasons set out above; satisfying the first prong of the credit-as-true analysis. The Commissioner argues the Court should apply the ordinary remand rule because there are outstanding issues that must be resolved. The Commissioner's argument that Lang's treatment providers were not able to explain his complaints without relying on his fibromyalgia diagnosis is unpersuasive because Lang's diagnosis of chronic pain syndrome sufficiently accounted for his symptom testimony. And, Dr. Ganter's statement that Lang's physical and mental capacities for work were undetermined did not create a conflict in the evidence for the reasons already discussed.

Therefore, the second prong of the credit-as-true analysis is met. Finally, crediting Lang's testimony—as supported by the opinion of Dr. Ganter—that he could not remain in the supine position for longer than 30 minutes at a time, required daily naps, and required extended periods of recovery after undertaking activities beyond his limited activities of daily living directs a finding of disability per the VE's testimony. Tr. 78, 82-83. Accordingly, no useful purpose would be served by further proceedings, and an immediate award of benefits is warranted on the record.

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision denying Lang's application for disability insurance benefits is REVERSED and REMANDED for an immediate payment of benefits.

**IT IS SO ORDERED**.

DATED this 8th day of May, 2018.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge